IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JAMES DSCHAAK,

                   Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                   Defendant.

_____

CV 10-1010-PK

FINDINGS AND
RECOMMENDATION

PAPAK, Judge:

      Plaintiff James Dschaak filed this action on August 26, 2010, seeking judicial review of the Commissioner of Social Security's final decision denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (the "Act"). This court has jurisdiction over Dschaak's action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

      Dschaak argues that by erroneously ignoring and rejecting medical evidence and Dschaak's own lay opinion testimony, the Commissioner failed to properly assess Dschaak's residual functional capacity after completing step three of the five-step sequential process for analyzing a Social Security claimant's entitlement to benefits, and thereby failed to carry his burden at step five of the process. I have considered all of the parties' briefs and all of the evidence in the administrative record. For the reasons set forth below, the Commissioner's

Page 1 – FINDINGS & RECOMMENDATION

decision should be reversed and remanded for further proceedings consistent with this opinion.

## DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At the first four steps of the process, the burden of proof is on the claimant; only at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the Administrative Law Judge ("ALJ") considers the claimant's work activity, if any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b), 416.920(a)(4)(i), 416.920(b). If the ALJ does not make such a finding, the evaluation will proceed to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments. *See Bowen*, 482 U.S. at 140-41; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities and is expected to persist for a period of twelve months or longer. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c). The ability to perform basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§

404.1521(b), 416.921(b); *see also Bowen*, 482 U.S. at 141.   If the ALJ finds that the claimant's impairments are not severe or do not meet the duration requirement, the claimant will be found not disabled.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity."  *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d).  If the claimant's impairments are equivalent to one of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will be conclusively found disabled.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all of the relevant medical and other evidence in the claimant's case record.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).  The RFC is an estimate of the claimant's capacity to perform sustained, work-related, physical and mental activities on a regular and continuing basis,[1] despite the limitations imposed by the claimant's impairments.  *See* 20 C.F.R. §§ 404.1545(a), 416.945(a); *see also* S.S.R. No. 96-8p, 1996 WL 374184.

 At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§

---

[1]  "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  S.S.R. No. 96-8p, 1996 WL 374184.

404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f).  In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof is, for the first time, on the Commissioner.

At the fifth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's age, education, and work experience to determine whether the claimant can perform any jobs that exist in significant numbers in the national economy.  *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566, 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966.  If the Commissioner meets his or her burden to demonstrate that the claimant is capable of performing jobs existing in significant numbers in the national economy, the claimant is conclusively found not to be disabled.  *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566, 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966.  A claimant will be found entitled to benefits if the Commissioner fails to meet his or her burden at the fifth step.  *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 416.920(a)(4)(v), 416.920(g).

## LEGAL STANDARD

A reviewing court must affirm an ALJ's decision if he or she applied proper legal standards and his or her findings are supported by substantial evidence in the record.  *See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r for Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004).  "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a

conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Id.*, *citing Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). However, the court may not substitute its judgment for that of the Commissioner. *See id.*, *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006); *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). If the ALJ's interpretation of the evidence is rational, it is immaterial that the evidence may be "susceptible [to] more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989), *citing Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

## BACKGROUND

Dschaak was born on June 30, 1971. Tr. 36, 155.[1] He suffers from and has an extensive family history of multiple recurrent exostoses, a hereditary[2] condition resulting in multiple recurring bony growths, also called osteochondromas, on his pelvis and bilateral upper and lower extremities most often at or near the joints. Tr. 41, 359-60, 364, 440-41, 465-66, 468-78, 484-90. Predominantly during childhood and adolescence, Dschaak underwent "over 16 surgeries" to remove exostoses from his body, most often from his shoulders, legs, and knees. Tr. 41, 359-60, 364, 440-41, 465-66, 468-78, 484-90. At age 14, he additionally underwent surgery to correct "a marked overgrowth in his left lower extremity of approximately two inches." Tr. 67-68, 464-70, 484-86.

Dschaak completed the tenth grade, though he reportedly repeated the first grade and

---

[1] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed herein as Docket No. 11.

[2] The record indicates that Dschaak's brother and mother both apparently share this condition, along with an aunt, grandfather, and uncle. Tr. 366, 423.

spent most of middle school, junior high school, and high school in special education classes. Tr. 38, 359, 372.  He did not earn a General Educational Development credential, instead entering the Job Corps after dropping out of high school.  Tr. 38.  However, Dschaak testified that he was subsequently removed from the Job Corps' educational program after approximately a year and a half because he was apparently "not achieving fast enough."  Tr. 48-49.  He has worked in the past—primarily for very short periods of time and on a part-time basis—as a landscaper, car counter, roofer, pressure washer, and car washer/car lot attendant.  Tr. 38-40, 359, 372.  Although homeless at times, for the past 15 years Dschaak has primarily lived with his disabled mother and aunt, for whom he runs errands and performs household tasks in exchange for lodging.  Tr. 37-38, 398, 411.

On September 14, 2007, Dschaak filed applications for both DIB benefits and SSI payments, Tr. 152, 155, with protective filing dates of September 11, 2007.  Tr. 25, 35.  In both applications, he alleged a disability onset date of December 31, 1993.  Tr. 152, 155.  Dschaak describes his disabling medical conditions as chronic, severe pain due to multiple hereditary exostoses, cracking, popping, pain, and cramps in his knees, hips, back, shoulders, and hands, two crushed discs in his back, fractured vertebrae, hip and knee problems due to asymmetrical leg length and a metal plate in his leg, knees and shoulders "giving out on [him]," chronic diarrhea due to pancreatitis, headaches, ongoing problems due to existing "tumors" caused by multiple hereditary exostoses and the numerous surgeries previously performed to remove some of them, and fear of "shear[ing] off one of [his existing] exostosis [sic] which would kill [him]." Tr. 39-41, 44, 227-28, 230-31, 360, 422.  He asserts that these conditions cause him pain "[e]very day" rating from eight to ten on a ten-point scale, with pain at a level of eight on his "best days."  Tr. 42.  Finally, he states that he suffers from depression, anxiety in public places,

and problems with learning, concentration, and memory.  Tr. 44-45, 47-48, 52, 276, 360-61, 366.

The earliest pertinent medical report appearing in the administrative record dates from December 10, 1980, at which time Dschaak was admitted to Deaconess Medical Center in Spokane, Washington for surgical excision of a "moderately large exostosis of the left proximal humerus which has been bothering him recently."  Tr. 474-76.  James Williams, M.D., diagnosed Dschaak with "[o]steochondroma, left humerus," and noted that Dschaak "has had a previous one removed on his right shoulder and x-rays have revealed exostoses over the clavicle and other areas. [Dschaak] has a family history of recurrent multiple exostoses."  Tr. 474.

On June 10, 1986, Dschaak was again admitted to Deaconess Medical Center "for leg inequality of the left lower extremity."  Tr. 468.  Dr. Williams again noted Dschaak's history of multiple hereditary exostoses, stating that "several of the exostoses have been removed previously."  *Id*.  A scanogram was taken on June 19, 1986, revealing "marked overgrowth in [Dschaak's] left lower extremity of approximately two inches."  Tr. 465, 467.  Dr. Williams subsequently performed surgery on July 10, 1986, consisting of "epiphysiodesis of [the] left distal femur."  Tr. 467.  Additional films of Dschaak's left knee obtained following surgery further revealed "multiple exostoses involving the distal femora and tibia and fibula compatible with congenital hereditary exostosis," and pathologist Franklin Martin, M.D. diagnosed "[e]xostosis, left femur: osteochondroma."  Tr. 470-72.

On June 6, 1988, at age 16, Dschaak was examined by radiologist Carol Wallace, M.D. at Shriners Hospital for Crippled Children.  Tr. 484.  Even after the 1986 surgery, Dschaak still exhibited "approximately 2.3 centimeters of leg length discrepancy, with the left being shorter than the right," along with "changes involving both proximal femora and hips that are secondary to the patient's multiple exostoses" as well as an exostosis involving the medial right acetabulum

and multiple exostoses involving the distal femora and proximal tibiae and fibulae.  *Id*.  Dr.
Wallace further noted that exostoses involving the distal fibulae "have caused changes in the
lateral tibial metaphyses," and detected mild genu valgum present bilaterally, multiple exostoses
off of the scapula tip on the right, exostoses involving the proximal humeral shaft, multiple
exostoses involving the proximal tibial and distal femoral shafts, and "[a]n extremely large
exostosis . . . seen off the right distal femur posteriorly."  *Id*.

At Shriners Hospital for Crippled Children, Dschaak additionally saw Robert Zirschky,
M.D., on June 9, 1988.  Tr. 485.  Dr. Zirschky stated that "[Dschaak] is being presented for
consideration of the left leg deformity," namely left valgus deformity below the knee and "2 to
2.5 cm. clinical limb length inequality" following the initial surgery.  *Id*.  In addition, Dr.
Zirschky noted that Dschaak had "multiple surgical excisions with previous painful exostoses,"
as well as current multiple exostoses on both legs and one "that is quite prominent on the
scapular spine on the right."  *Id*.  X-rays showed "significant valgus of the tibia of 14 degrees,"
and Dr. Zirschky recommended placing Dschaak on a waiting list for a left tibial osteotomy, as
well as a tibial tubercle.  *Id*.  They discussed surgical options "ranging from a pin and cast to a
reamed rod or plate fixation."  *Id*.  Though the documentation does not appear in the
administrative record, it appears that the surgery was performed given Dschaak's testimony on
October 14, 2009 that he has a "metal plate" in his leg, Tr. 40-41, and subsequent X-rays in the
record confirming this statement.  Tr. 420, 435.

The administrative record[3] next indicates that Dschaak presented to orthopedic surgeon

---

[3]  Later reports in the record indicate that Dschaak apparently sustained a closed head injury in
1993 after being assaulted and hit over the head with a 32-ounce beer bottle, Tr. 360, 362, 366,
and then fell from a roof some unspecified number of years later.  Tr. 372-73, 422.  The
administrative record contains no documentation of treatment for these injuries, which is

Robert Berselli, M.D., on December 12, 2002, after being rear-ended by another vehicle on

October 13, 2002, and subsequently experiencing mid and low back pain along with tingling in

the left lower extremity. Tr. 454. This examination was apparently arranged by Gail Brock of

Southeast Portland Disability Services. *Id*. Dr. Berselli noted that Dschaak saw a chiropractic

physician following the accident, "but manipulations were not particularly helpful." *Id*.

Regarding Dschaak's medical history, Dr. Berselli stated: "His past medical history is quite

significant in that the patient has a history of exostoses, and indeed, had extensive surgeries done

on both lower extremities at Shriner's Hospital as a child. He states that he has a plate in his left

tibia as well." *Id*. Examination of the spine revealed a "good deal of spasm and tenderness in the

parathoracic and paralumbar area," though no sciatic notch tenderness was present and straight

leg raising tests were negative. *Id*. Dr. Berselli ordered X-rays, stating that "[t]he patient, I

think, has sustained an acute sprain of the thoracic and lumbar spine, secondary to the above-

noted motor vehicle accident. X-rays were ordered of the thoracic and lumbar spine. I will see

the patient after that has been done." Tr. 455. Dr. Berselli also noted a long anterolateral scar

over the left tibial area, with numerous other scars about the left knee and lateral aspects of both

knees, presumably due to multiple surgeries to remove exostoses. Tr. 454.

 X-rays of Dschaak's lumbar and thoracic spine were taken immediately following his

appointment with Dr. Berselli, and were initially evaluated by radiologist Waleed Qaisi, M.D.

Tr. 451-52. Dr. Qaisi opined that the X-rays revealed "33% anterior wedge compression of T12

vertebral body, age undetermined" and "30% anterior compression fracture of T12, age

undetermined." *Id*. Dschaak then followed up with Dr. Berselli on December 19, 2002, at which

time Dr. Berselli confirmed these findings, diagnosing a "30% anterior compression fracture of

---

consistent with Dschaak's reported lack of funds and health insurance. Tr. 40. However,
Dschaak did report that he received stitches following the apparent assault in 1993. Tr. 360.

T12." Tr. 453.

On January 17, 2004, Dschaak saw Donald Ramsthel, M.D., for a state agency consultative examination. Tr. 366-68. Dschaak complained of low back pain, bilateral knee pain and pain in the legs radiating down into the knees, pain in the other joints, occasional numbness in the buttocks, and "constant pain in his shoulders, behind his knees, and in the hips." Tr. 366. Dr. Ramsthel noted Dschaak's hereditary exostoses, 16 related surgeries, prior left leg surgeries, and the 2002 rear-end motor vehicle accident "which left him with two compression fractures and a fracture of the vertebra. It is not known whether this was the body of the vertebra or the transverse process." *Id*. Dr. Ramsthel noted that "[Dschaak] indicates that he is homeless. He can do his ADL's and minimal chores." *Id*. Dschaak additionally reported that his pain "is aggravated by increased activities or prolonged sitting," and Dr. Ramsthel noted that it was also "aggravated by [the] Valsalva [maneuver]." *Id*.

Dschaak further told Dr. Ramsthel that he sustained a head injury in 1993, and indicated that since that time "his memory has been worse." Tr. 367. Dr. Ramsthel noted that Dschaak uses marijuana daily, and a "review of systems" was "[p]ositive for headaches three times a month and poor teeth." *Id*. Dr. Ramsthel opined that Dschaak's "affect appears to be normal," with appropriate behavior, memory, tracking, and conversational understanding. *Id*. He found no arthritic stigmata, crepitus, tenderness, deformity, or effusion in the extremities, and made an assessment and diagnosis of "1. Chronic low back pain, with a history of radicular component, but very little in the way of physical abnormalities at this point, i.e. sensation and reflexes are intact. 2. He has hereditary exostosis [*sic*], multiple." Tr. 367-68. Regarding Dschaak's "estimated work related activities," Dr. Ramsthel opined that Dschaak could stand and walk for "about 1-1/2 hours, with resting 15-20 minutes, resulting in about 5-6 hours walking in an 8-hour

day; sitting is a little bit less. He indicates that he could probably sit for about 3/4 of an hour before having to get up and move around, resulting in about 4 hours of sitting per day." Tr. 368. Dr. Ramsthel further opined that Dschaak could infrequently lift and carry 30 pounds and frequently lift and carry 10-15 pounds, and had an unlimited capacity for hearing and speaking, handling objects, and travel. *Id.*

On February 4, 2004, state agency medical consultant and psychologist Dorothy Anderson, Ph.D., reviewed Dschaak's records and completed a Psychiatric Review Technique form. Tr. 340, 348. She opined that Dschaak was limited only by mild difficulties in maintaining concentration, persistence, or pace, and apparently based on evidence not in the administrative record stated that "[Dschaak's] contention of a learning problem is countered by his own statement that he can learn what he's interested in." Tr. 352. Dr. Anderson appears to have relied heavily on Dr. Ramsthel's recent examination, repeating his observations regarding Dschaak's appropriate behavior, memory, and tracking. *Id.* She finally stated: "[The] [o]nly established [medically determinable impairment] is marijuana use, [with] no severe impact of function." *Id.*[4]

The following day, on February 5, 2004, state agency medical consultant and physician Linda Jensen, M.D., conducted a review of Dschaak's records and an RFC assessment. Tr. 334-39. Like Dr. Anderson, Dr. Jensen appeared to rely almost exclusively on Dr. Ramsthel's prior examination and findings, opining that "[i]nformation sufficient to draw conclusions doesn't occur until 1/17/04 [consultative examination]" and essentially repeating Dr. Ramsthel's observations. Tr. 336-37. Based on this review of a limited record, Dr. Jensen opined that

---

[4] Dr. Anderson conducted a subsequent review of Dschaak's records on February 27, 2008 in which, presumably due to the availability of additional records for review, she found that Dschaak suffered from significant limitations. Tr. 399-416. This later opinion in large part contradicts the 2004 opinion described above. *Id.*; Tr. 340-52.

Dschaak could occasionally lift 30 pounds, frequently lift 10 pounds, stand and walk with normal breaks "about 6 hours in an 8-hour workday," sit with normal breaks "about 6 hours in an 8-hour workday," and was unlimited in his ability to push and pull "other than as shown for lift and/or carry."  Tr. 335.

On May 12, 2004, state agency medical consultant and psychologist Cheryl Brischetto, M.D., reviewed medical records provided by Oregon's Disability Determination Services (DDS), conducted a clinical interview with Dschaak, and performed a mental status evaluation including administration of several tests.  Tr. 358-65.  Dr. Brischetto obtained background information from Dschaak during the interview, as well as from one unspecified medical record from DDS, and initially noted that Dschaak's mother had a history of alcohol problems, that Dschaak had been homeless for some time—living with friends for the past two to three months—and that although Dschaak had been on the Oregon Health Plan (OHP) and food stamps in the past, at the time of the interview he had no health insurance, no residence, and no income.  Tr. 358.  She noted that Dschaak had primarily been in special education classes throughout school until he dropped out during the eleventh grade, that his last "real job" consisted of counting cars for the Oregon Department of Transportation for approximately one month, and that Dschaak found it hard to perform physical work due to back pain while also finding it difficult to sit for prolonged periods.  Tr. 359.  She further reported that Dschaak stated that his employment as a car lot attendant was terminated because "they thought he was too slow, although he didn't think so." *Id*.  Dr. Brischetto noted Dschaak's history of multiple hereditary exostoses and the fact that as a child "he spent a great deal of time at Shriner's Hospital," stating that Dschaak reported hip pain and pain behind the knees "where bony growths occur."  Tr. 359-60.  She additionally noted Dschaak's chronic lower back pain following the rear-end motor vehicle accident in 2002, and

reported that "[h]e said a couple of years ago he was assaulted and hit over the head with a 32-ounce beer bottle . . . and perhaps could have lost consciousness for just seconds . . . [h]e said he has had headaches since that time." Tr. 360. However, in assessing Dschaak's cognitive difficulties later in her report, Dr. Brischetto stated: "He had trouble remembering the date of his motor vehicle accident and also reported that he had been hit on the head with a beer bottle just a few years ago. Records indicated that was in 1993, at least according to his report at that time." Tr. 362.

Dr. Brischetto noted that Dschaak used medical marijuana to treat his pain, though "[h]e has no treating physician" and "said he doesn't buy [marijuana], but gets it from friends." Tr. 360. Dr. Brischetto further noted that friends provide Dschaak with food "because he doesn't have any money." *Id.* Regarding Dschaak's presenting complaint, Dr. Brischetto stated that Dschaak "has good days and bad days," and "on a bad day he will stay home and not do anything." *Id.* Dschaak reported sleeping only four to five hours per night "at the most" due to pain, and then taking naps during the day. *Id.* He reported that he does do some cooking and household chores, including vacuuming, sweeping the kitchen, and doing his own laundry. Tr. 361. With regard to mental impairment, Dschaak reported that he feels "like falling," or "claustrophobic," when surrounded by other people, that he has always been a "slowed learner" and "forgets stuff," and that his memory has worsened since the aforementioned assault with a beer bottle. Tr. 360-61.

Upon examination Dr. Brischetto noted that Dschaak's grooming and hygiene "were fair at best" and his clothing was "dirty and covered with some animal hair and paint stains" apparently because he was simply wearing old clothing. Tr. 361. She noted no pain behavior during the session, and stated that Dschaak "seemed engaged in the testing process for the most

part" and "appeared to put forth *good* effort." *Id*. (emphasis original). Dschaak stated that he

had not yet used marijuana that day. *Id*. Testing for language and thinking indicated that

Dschaak "was able to follow one and two step commands without difficulty," did not evidence

any psychotic thought process or delusional thinking, and had adequate insight and capacity for

common sense. Tr. 361-62. On the Wechsler Adult Intelligence Scale III (WAIS III), he scored

in the low average range for vocabulary, comprehension, and similarities (verbal abstractions),

and in the borderline range for fluid nonverbal reasoning. *Id*. On testing for attention and

memory, "[o]n formal measures he was in an *extremely low* range on the Working Memory

Index of the WAIS III. This refers to verbal working memory or the capacity to assimilate,

manipulate and immediately recall verbal information." Tr. 362 (emphasis in original). In

connection with this test Dr. Brischetto noted that Dschaak "seemed to have particular difficulty

with Letter/Number Sequencing. He even had difficulty initially understanding the directions for

this task." *Id*. Dschaak scored below the normal range on digit span testing, was in the

borderline range on the Processing Speed Index of the WAIS III, and as noted above had

difficulty with dates when providing his history. *Id*. On achievement testing Dschaak scored in

the borderline range on spelling and in the low average range on reading recognition, and Dr.

Brischetto noted, regarding his "[g]eneral [a]bility," that "all of his summary scores were in a

*borderline* range." *Id*. (emphasis original).

       Dr. Brischetto ultimately evaluated Dschaak as follows:

> He did report a history of head injury, although records indicated it was in 1993. A rule
> out of a Cognitive Disorder NOS is noted. Functionally, though, he did indicate some
> capacity for memory. He would be a good candidate for further achievement testing . . .
> Current general ability testing did indicate some attentional slowing relative to his
> functioning on tasks of old-well [*sic*] learned verbal information and perceptual and
> visuospacial reasoning tasks. In other mental status Mr. Dschaak was able to follow one
> step and most two step commands. He did have difficulty with multistep instructions,
> such as for the Letter/Number Sequencing test. Thinking was logical and organized.

Page 14 – FINDINGS & RECOMMENDATION

There was no indication of psychotic thought process.

Tr. 363-64.  Dr. Brischetto diagnosed rule out learning disorder NOS (315.90), rule out cognitive

disorder NOS (294.90), and cannabis dependence (304.30) at Axis I.  Tr. 364.  She further

diagnosed "chronic back pain, exostosis, some joint pain" at Axis III, "[h]omeless, no income, no

health insurance" at Axis IV, and at Axis V assessed Dschaak's current Global Assessment of

Functioning (GAF) at 68.  *Id.*  Finally, Dr. Brischetto opined that "[t]his gentleman again would

be a good candidate for further achievement testing and also more specific testing with regard to

memory and learning."  Tr. 365.

Shortly after Dr. Brischetto's examination, state agency medical consultant and

psychologist Paul Rethinger, Ph.D., reviewed Dschaak's records and completed a functional

capacity assessment and Psychiatric Review Technique form.  Tr. 316-30.  On the functional

capacity assessment, Dr. Rethinger found no significant limitations aside from moderate

limitation in the ability to understand and remember detailed instructions and moderate limitation

in the ability to carry out detailed instructions, opining that "[Dschaak] can follow simple 2 step

tasks as shown on S/04 [consultative examination] but would have difficulty with multistep

tasks.  This is supported by low-average and borderline subtest scores and the [medically

determinable impairments] of [rule out] cognitive [disorder] [and] [rule out] learning [disorder]."

Tr. 316-18.  On the Psychiatric Review Technique form, Dr. Rethinger assessed rule out learning

disorder and rule out cognitive disorder under category 12.02, as well as marijuana addiction

under 12.09.  Tr. 320.  He additionally checked the box marked "Insufficient Evidence,"

presumably in relation to the "rule out" diagnoses.  *Id.*  Somewhat ambiguously given the "rule

out" diagnoses previously noted, Dr. Rethinger assessed—under 12.02: Organic Mental

Disorders—"[a] medically determinable impairment . . . that does not precisely satisfy the

diagnostic criteria [listed above on Form SSA-2506-BK]," namely "learning [disorder]; cognitive [disorder]," without elaborating.[5]  Tr. 321.  This notation is followed on the form by a box accompanied by the notation, "[i]nsufficient evidence to substantiate the presence of the disorder," and Dr. Rethinger did *not* check this box.  *Id*.  Finally, based on his diagnoses under listings 12.02 and 12.09, Dr. Rethinger opined that Dschaak experiences mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  Tr. 330.

On June 26, 2007, Dschaak presented in the Emergency Room at Legacy Mount Hood Medical Center with severe, "stabbing and burning" abdominal pain that had lasted nearly five hours.  Tr. 445.  After a full examination including blood and urine testing, Michael Murray, M.D. prescribed Zantac and clear liquids only and discharged Dschaak with a diagnosis of abdominal pain, mild hematuria, gastritis, "[p]ossible gastroesophageal reflux disease," "[p]ossible peptic ulcer disease," and "[p]ossible pancreatitis."  Tr. 445-49.

Dschaak was next examined by state agency medical consultant and physician Terri Robinson, M.D., on February 11, 2008.  Tr. 422-26.  Dschaak presented complaining of chronic pain due to multiple exostoses primarily involving his upper and lower extremities, as well as back pain.  Tr. 422.  Dschaak additionally complained of chronic diarrhea persisting over the past year, which he believed to be caused by chronic pancreatitis.  *Id*.  Dr. Robinson reviewed Dschaak's records and noted the lumbar spine radiograph dated December 12, 2002, indicating that Dschaak "has a wedge compression fracture of T12," as well as Dr. Murray's June 26, 2007, diagnosis of "gastritis and reflux."  Tr. 422.  Dr. Robinson further noted that Dschaak had a medical marijuana permit that "has since been discontinued," and stated that "while he was on

[5]  However, Dr. Rethinger conducted another review of Dschaak's records in 2008, and, as described below, did not even discuss the possibility of a cognitive impairment.  Tr. 432.

the medical marijuana, it did help his pain. He states that it also helped his back pain." *Id*. With regard to Dschaak's activities of daily living, Dr. Robinson noted that Dschaak lives with and cares for his chronically ill mother and aunt, and "is able to take care of himself and attend to his personal hygiene and needs. He is able to do light cooking and housework." *Id*. Dr. Robinson noted that Dschaak was taking Zantac, as well as penicillin for chronic ear pain that Dschaak believed to be related to multiple dental caries, and further noted that Dschaak had been diagnosed with pancreatitis in 2007 and had undergone "multiple surgeries on his lower extremities including a derotational osteotomy as a child." Tr. 423.

Upon physical examination, Dr. Robinson noted "no acute distress" as well as "no evidence of poor effort or inconsistencies." *Id*. She found "mild epigastric tenderness to palpation," "multiple surgical scars about [Dschaak's] knees and hips bilaterally," negative Romberg test, negative straight leg raising test, "completely intact" grasping ability, mild crepitus in the knees bilaterally with flexion, mild tenderness to the lumbar spine with palpation, 4/5 strength in the bilateral upper and lower extremities, and 5/5 grip strength bilaterally. Tr. 424-25. She conducted full range of motion testing, revealing "decreased range of motion in [the] lower extremities," as well as decreased range of motion in the upper extremities and mildly decreased range of motion in the lumbar spine. *Id*. Dr. Robinson diagnosed multiple exostoses and low back pain. Tr. 425. With regard to Dschaak's functional limitations, Dr. Robinson opined that "[t]he number of hours that the claimant could be expected to stand and walk in an eight-hour day is about three hours with breaks due to the claimant's decreased range of motion in his lower extremities and mildly decreased strength in the lower extremities." *Id*. She further opined that Dschaak could sit without restriction in an eight-hour day, and lift or carry ten pounds frequently and "about 25 pounds occasionally due to mildly decreased strength

in the upper extremities, as well as decreased range of motion in the upper and lower

extremities." *Id*. Finally, Dr. Robinson opined that Dschaak had "postural limitations on

bending due to mildly decreased range of motion at the lumbar spine," but had no manipulative

limitations nor any relevant visual, communicative, or workplace environmental limitations. Tr.

426.

      X-rays of Dschaak's thoracic spine, lumbar spine, and left knee were taken this same day,

and were evaluated by radiologist Ryan Taylor, M.D. of Broadway Medical Clinic in an X-ray

report ordered by DDS. Tr. 420-21. Based on 3 views of Dschaak's thoracic spine, Dr. Taylor

noted a compression fracture of T11 with approximately 40% loss of anterior vertebral body

height. Tr. 420. He opined that "[t]he bones appear osteopenic," indicating low bone density,

and noted "[m]ild degenerative disc changes [that] are present at several levels." *Id*. He

diagnosed "T11 compression fracture," and "Early degenerative changes." *Id*. Based on two

views of Dschaak's lumbar spine, Dr. Taylor again noted the T11 compression fracture, as well

as rightward curvature at the thoracolumbar junction, mild degenerative facet changes in the

lower lumbar spine, and hypertrophic spurring on the superior aspect of the pubic symphysis. *Id*.

He diagnosed "T11 compression fracture," "Degenerative facet changes in the lower lumbar

spine," and "Degenerative changes at the pubic symphysis." *Id*. Based on two views of

Dschaak's left knee, Dr. Taylor noted plate and screw fixation on the proximal shaft of the tibia,

and opined that "[f]ractures of the proximal tibia and fibula appear well healed though there is

residual post traumatic deformity." *Id*. He additionally opined that "[t]here appear to be

secondary degenerative changes at the proximal tibiofibular joint," and noted "mild spurring

along the lateral aspect of the joint" along with "a bulbous appearance of the medial metaphysis

at the distal femur and irregularity along the cortex which is most likely also related to prior

trauma." Tr. 421. Dr. Taylor diagnosed "[p]ost-traumatic and post-surgical changes with secondary osteoarthritis." *Id*.

DDS then ordered a psychodiagnostic interview examination, conducted on February 15, 2008, by psychologist Christopher Tongue, Ph.D. Tr. 372-75. This appears to have been ordered based on an interview with Dschaak conducted by G. Guerrero of DDS on September 15, 2007, Tr. 260-63, after which Mr. Guerrero wrote:

> [Dschaak] was agitated during interview. He is extremely thin, looking almost like a concentration camp survivor. His hands were very dirty and while he did not smell, his clothes were torn and dirty. He said he cannot get food stamps and that he cares for his mother and aunt. It is very likely that he has some mental condition other than the depression he mentioned. Consultative exam recommended, specially [*sic*] a psychiatric one.

Tr. 262. Dr. Tongue's psychodiagnostic examination followed, including a clinical interview, review of Dschaak's records, and a formal mental status evaluation. Tr. 372.

Regarding Dschaak's history, Dr. Tongue noted that Dschaak's mother was "a long term alcoholic who obtained sobriety three years ago," as well as Dschaak's placement in "special education throughout his school years." *Id*. He noted that Dschaak "has never had a girlfriend or any kind of romantic relationship," and that Dschaak reported living with his mother and aunt, doing some house cleaning and cooking for them. Tr. 372-73. Dr. Tongue noted Dschaak's history of multiple hereditary exostoses including "multiple surgeries to remove bone tumors over the course of his life," as well as a history of frequent ear infections, a myringotomy during his childhood years, and "severe dental caries, which he says are a source of chronic pain." Tr. 373. Dschaak also reported chronic pain in his back "due to a motor vehicle accident in addition to his history of bone disease." *Id*. Regarding medications, Dr. Tongue noted that Dschaak "has a medical marijuana card and has used cannabis on a regular basis for the past decade to help with pain. He says the medical marijuana card has lapsed due to his lack of funds and inability

to pay the fees.  He denies any other drug use, and says at present he has no medication to treat

any of his pain." *Id*.  Dr. Tongue did note that Dschaak had been prescribed oxycodone in the

past for tooth pain.  *Id*.

Dschaak presented to Dr. Tongue reporting "episodic bouts of suicide ideation which he

estimates occur approximately once a year," depression, and poor sleep "primarily due to waking

with pain in various places on his body." *Id*.  Dschaak reported having a poor appetite, stating

that "he eats once per day and snacks at some other point during the day." *Id*.  Dschaak also

"complain[ed] of some anxiety when he is in public places such as grocery stores." *Id*.

Regarding his activities of daily living, Dschaak reported that in the morning he cleans up the

dishes from the previous night's meal, often vacuums the house, and then watches television or

plays a video game on the computer.  *Id*.  He reported resting from 30 minutes to one hour to

"stay off [his] back," and doing some household chores and running errands for his mother and

aunt.  *Id*.  Dr. Tongue noted that "[y]ard work is done by a landscaping service," and that

Dschaak's cooking is dictated by the family's funds—ranging from "a roast or potatoes" toward

the beginning of the month to "things such as Rice-A-Roni" when food is less available toward

the end of the month.  Tr. 373-74.   Dschaak reported spending his evenings watching television.

Tr. 374.

Upon examination Dr. Tongue noted that Dschaak appeared "quite gaunt" and had

several dental caries, though he showed "adequate self-care, grooming, and personal hygiene."

*Id*.  Dr. Tongue stated that "[Dschaak's] insight into the nature and purpose of the evaluation was

fair, and he appears to be of somewhat limited intellect." *Id*.  Dschaak was "initially wrong on

the day of the week saying it was a Monday when it was a Friday," but was "able to follow a

three-step command without difficulty." *Id*.  Dr. Tongue opined that "Mr. Dschaak's memory

appeared poor," that "[h]is reasoning was mildly concrete" and that "his capacity for everyday

problem solving appears limited."  *Id.*  Summarizing his findings, Dr. Tongue stated:

> [Dschaak] appears to be of limited intellect; I would estimate his overall IQ to be
> in the borderline range.  His attention and concentration appear to be normal, but
> he shows impairment in verbal learning and memory.  It is quite likely that he has
> a long standing language based learning disability.  At present, he does not appear
> to be suffering from severe symptoms of mood, anxiety, or thought disorder. He
> does, however, report chronic pain interfering with his daily activities and
> functioning to a significant degree.  Mental health symptoms by themselves are
> unlikely to be something that would prevent him from employment; however, his
> limited intellect and learning problems are likely to have contributed to his
> inability to participate in gainful employment in the past. A more thorough
> intellectual assessment would help to clarify his abilities.

Tr. 374-75.  Dr. Tongue ultimately diagnosed "[a]djustment disorder with depressed mood

secondary to medical condition," and "[l]earning disorder NOS by history" at Axis I, and

"[s]tressors: [u]nemployment, poverty, moderate social isolation" at Axis IV.  Tr. 375.

Shortly thereafter, on February 27, 2008, Dr. Anderson again reviewed Dschaak's

medical records and completed a Psychiatric Review Technique form (Form SSA-2506-BK) in

which she reached conclusions differing drastically from her earlier 2004 review of Dschaak's

then-existing records.  Tr. 340-52, 399-416.  Dr. Anderson noted coexisting nonmental

impairment(s) requiring referral to another medial specialty, and based her medical disposition

on categories 12.02 (Organic Mental Disorders), 12.04 (Affective Disorders), and 12.09

(Substance Addiction Disorders).  Tr. 399.  She diagnosed "[rule out] learning and cognitive

[disorders] NOS," as well as "adjustment [disorder] with depressed mood secondary to medical

conditio[n]" and "cannabis dependence."  Tr. 400, 402, 407.  She opined that these impairments

caused Dschaak mild restriction of activities of daily living, mild difficulties in maintaining

social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.

Tr. 409.  Dr. Anderson's notes essentially repeat the findings made by Drs. Brischetto, Robinson,

and Tongue, which are set forth in detail above.  Tr. 411.  In completing a mental RFC assessment, Dr. Anderson found moderate limitation in the ability to understand and remember detailed instructions, moderate limitation in the ability to carry out detailed instructions, and moderate limitation in the ability to set realistic goals or make plans independently of others.  Tr. 413-14.  She ultimately opined that Dschaak "is capable of understanding, remembering, and carrying out simple, routine instructions, but not more detailed ones."  Tr. 415.

Also on February 27, 2008, state agency medical consultant and physician Neal Berner, M.D., reviewed Dschaak's medical records and completed a physical RFC assessment (Form SSA-4734-BK).  Tr. 391-98.  Dr. Berner noted diagnoses of lumbar degenerative disc disease, mild thoracic degenerative disc disease, and multiple exostoses.  Tr. 391.  Based on a review of Dschaak's records, he opined that Dschaak was capable of occasionally lifting 20 pounds, frequently lifting ten pounds, standing and/or walking with normal breaks for a total of at least two hours in an eight-hour workday, sitting for approximately six hours in an eight-hour workday, and pushing and/or pulling without restriction except as noted for lifting and carrying. Tr. 392.  He further opined that Dschaak could occasionally climb, balance, stoop, crouch, and crawl, and frequently balance.  Tr. 393.  He assessed no manipulative, visual, communicative, nor environmental limitations, echoed the findings of Drs. Robinson and Taylor regarding objective medical evidence of Dschaak's conditions, and ultimately opined that Dschaak was limited to a "sedentary" RFC with additional postural limitations.  Tr. 394-95, 398.

Another state agency medical consultant and physician, Richard Alley, M.D., reviewed Dschaak's medical records and issued a brief physical summary on May 6, 2008.  Tr. 431.  Dr. Alley noted allegations of bone disease, back pain, depression, anxiety, and anger, and with regard to objective medical evidence noted that X-rays showed a T11 compression fracture with

some early degenerative changes, degenerative disc disease in the lumbar spine, and

degenerative changes at the pubic symphysis. *Id*. He further noted "post deformity" in

Dschaak's left knee following surgery, mild crepitus bilaterally in the knees, bony

growths/exostoses, lumbar spine tenderness, and decreased range of motion in the lumbar spine.

*Id*. Apparently echoing Dr. Robinson's assessment of February 11, 2008, Dr. Alley stated: "[i]t

was felt he was capable of stand[ing] [and/or] walk[ing] 3 hrs in [an] 8 hr day due to dec[reased]

[range of motion] in legs and dec[reased] strength in legs. Sitting [without] restriction. . . .

Sed[entary] RFC outlined with postural restrictions." *Id*.

Also on May 6, 2008, Dr. Rethinger again reviewed Dschaak's medical records and

completed a brief mental summary. Tr. 432. It appears that this was based almost entirely on

review of Dr. Tongue's consultative examination and findings of February 15, 2008. *Id*. In fact,

this most recent report by Dr. Rethinger appears to consist of a highly abbreviated summary of

portions of Dr. Tongue's report. It reads in full as follows:

> 2/15/08 [consultative examination]: Tongue. Is capable. [Thirty-seven] yr old w/
> complaints of depression, anxiety and anger. No family [history] of mental
> issues. Has one brother. Childhood good. Did move between parents and uncle
> and did drop out his jr. yr. Was in special ed[ucation] but unknown why. No
> military. One stint in jail for 58 days for malicious mischief at 21. Some short
> term work back when 21 or 22. Has not worked since. Nevermarriedor [sic] had
> partner/girlfriend etc. Lives with aunt and mother. Does the housework, cooking
> etc. No [history] of [inpatient] psych[iatric] [treatment] or counseling. Only
> medications. [Complains of] depression with cyclic suicidal thinking. Poor sleep
> due to pain. Poor appetite. No hal[lucinations]/del[usions]. No OCD issues.
> Does not like public places. Takes care of the home, watches TV, plays video
> games, naps, runs errands for mom/aunt, no yard work, has a couple of friends.
> He is 5'8" and 126 lbs. Rather gaunt. Self care is adequate. Normal affect.
> Insight fair with limited intellect. [Diagnosis] Axis I: Adjustment disorder with
> depressed mood, learning disorder NOS-by [history].

*Id*.

On July 6, 2009, Dschaak presented to orthopedic surgeon Zachary Adler, M.D., at

OHSU's Orthopedic Oncology Clinic "for evaluation of his multiple hereditary exostoses." Tr. 436-37, 440. Dschaak's primary complaint was "pelvic, knee, and tibia pain bilaterally." Tr. 440. Dr. Adler noted that Dschaak was taking medical marijuana for his pain but lost his prescription, that winter weather exacerbated Dschaak's pain, and that Dschaak's current pain level was rated at "10 (severe)." *Id*. Dr. Adler further noted Dschaak's extensive family history of multiple hereditary exostoses, and upon physical examination found "palpable masses, consistent with osteochondromas about the scapula and right proximal humerus." Tr. 436. Dr. Adler further found "multiple palpable masses about the hips, femurs, as well as tibias and fibulas that are consistent with osteochondromas," finding some of them tender to palpation. Tr. 437. He additionally examined a film dated June 15, 2009 that revealed "osseous abnormalities consistent with multiple hereditary exostoses." *Id*. Dr. Adler then ordered multiple X-rays, which were taken the same day and reviewed by Erik Foss, M.D. and then again by Dr. Adler before conferring with Dschaak. *Id*.; 435, 439, 441.

Based on X-rays of Dschaak's left knee, Dr. Foss observed a 0.7 centimeter pedunculated osteochondroma arising from the medial margin of the distal femoral metaphysis, along with "concavity along the medial aspect of the distal metaphysis which could conceivably represent a broad, sessile osteochondroma." Tr. 441. He additionally noted an osteochondroma arising from the posterior margin of the proximal fibula. *Id*. On Dschaak's right knee, Dr. Foss observed a sessile osteochondroma arising from the anterior margin of the distal femoral metaphysis "measuring up to 6 cm craniocaudad [by] 1 cm," along with "2 osteochondromas arising from the posterior distal diaphyseal cortex, measuring up to 3.5 cm in length" and an osteochondroma arising from the medial margin of the proximal tibial metaphysis, measuring 2.7 centimeters craniocaudad by 1.2 centimeters transverse. *Id*. Finally, Dr. Foss observed an osteochondroma

Page 24 – FINDINGS & RECOMMENDATION

arising from the posteromedial margin of the proximal fibula, measuring "up to 5 cm craniocaudad [by] at least 1.3 cm." *Id*. More generally, Dr. Foss's impression consisted of "[m]ultiple osteochondromas arising from the distal femora and proximal tibia and fibula bilaterally." *Id*.

Based on X-rays of Dschaak's pelvis and hips bilaterally, in the right hip Dr. Foss observed "at least two or three" small, predominantly sessile osteochondromas, one of which arose from the medial margin of the femoral head/neck junction and measured "up to 1 cm craniocaudad [by] 0.5 cm transverse." Tr. 439. Dr. Foss also opined that "[t]here is also likely a subcentimeter osteochondroma originating slightly caudal to the greater trochanter," and that "[t]here may also be a small osteochondroma arising from the intertrochanteric region, mostly obscured by overlying bone." *Id*. In Dschaak's left hip, Dr. Foss observed "marked broadening of the inferomedial aspect of the femoral neck and lesser trochanteric region consistent with a broad, sessile osteochondroma," and noted that "[a] second osteochondroma projects just below the greater trochanter, measuring at least 1 cm in diameter." *Id*. Dr. Foss further stated: "In the remainder of the pelvis, a 1.4 [by] 0.7 cm osteochondroma projects from the superior margin of the pubic body across the symphysis pubis." *Id*. He also noted another possible osteochondroma in the superior right iliac wing, and gave the following impression: "Multiple osteochondromas arising from both proximal femora as well as the right pubic body and possibly the right iliac wing." *Id*.

Finally, based on X-rays of Dschaak's left tibia and fibula, Dr. Foss noted a plate and multiple screws traversing the proximal tibial diaphysis, and "an exostosis arising from the posterior margin of the proximal tibia measuring up to approximately 7.6 cm craniocaudad by 3.5 cm." Tr. 435. He also observed "abnormal concavity along the lateral aspect of the proximal

tibial diaphysis with evidence of chronic remodeling along the adjacent medial fibular margin, most likely representing a sequel of old, resected osteochondroma." *Id*. Dr. Foss stated that "[d]egenerative joint disease is identified at the proximal tibiofibular joint," along with a "probable 0.6 centimeter osteochondroma arising from the medial margin of the proximal tibial metaphysis." *Id*. Finally, he observed that "there may be a sessile osteochondroma along the posterior margin of the distal diametaphysis," and offered the following impression: "Multiple osteochondromas arising from the proximal lower leg, with postsurgical changes in the proximal-mid lower leg. Possible osteochondroma of the distal tibia." *Id*.

Dr. Adler reviewed the X-rays described above, stating that they "demonstrate multiple hereditary exostoses about the pelvis, femurs, tibias and fibulas," and opining that "[n]one of these are concerning for malignant degeneration. Tr. 437. He recommended that Dschaak return in six months for another X-ray of the pelvis and imaging of "any new masses or lesions that have changed in size or changed in pain or quality," stating: "I do believe that these multiple osteochondromas are contributing to his chronic pain." *Id*. Dr. Adler additionally ordered medical marijuana, presumably for pain. *Id*.

On October 14, 2009, after Dschaak's DIB and SSI claims were denied initially and upon reconsideration, an appeal hearing was held before ALJ Patricia E. Hartman. Tr. 16, 33-57. The ALJ heard testimony from Dschaak, and from vocational expert Diane Weber. Tr. 33-57. Approximately one month later, on November 19, 2009, the ALJ issued an unfavorable decision, finding that Dschaak was not disabled. Tr. 16-25. At step five of the sequential evaluation process, the ALJ found that Dschaak retained the residual functional capacity to perform light, simple occupations existing in significant numbers in the national economy such as laundry sorter, ticket taker, and cafeteria attendant. Tr. 20-25. On this basis, the ALJ concluded that

Dschaak did not meet the criteria for disability.

Dschaak timely requested administrative review of the ALJ's decision, Tr. 11-12, and the Appeals Council denied his request on January 22, 2010. Tr. 8-10. Dschaak then timely filed a second request for review and a request for a copy of the hearing recording and an extension of time in order to submit a brief and new evidence. Tr. 7. The Appeals Council construed this as a request for reopening, and subsequently denied that request on May 28, 2010. Tr. 5-6. The Appeals Council then "set[] aside [its] earlier actions to consider additional information," but again denied Dschaak's request for review on July 13, 2010. Tr. 1-4. Accordingly, the ALJ's decision of November 19, 2009 became the Agency's final order for purposes of judicial review. *See* 20 C.F.R. § 422.210(a); *see also*, *e.g.*, *Sims v. Apfel*, 530 U.S. 103, 107 (2000). This action followed.

## SUMMARY OF ALJ FINDINGS

At the first step of the five-step sequential evaluation process, the ALJ found in her decision of November 19, 2009 that Dschaak did not engage in substantial gainful activity at any time following his alleged disability onset date of December 31, 1993. Tr. 18. She therefore proceeded to the second step of the analysis.

At the second step, the ALJ found that Dschaak's "[e]xostoses with osteochondromas, lumbar spine impairments, left knee disorders, learning disorder, and adjustment disorder with depressed mood" constituted "severe" medical impairments for purposes of the Act. Tr. 18. Because the combination of impairments was deemed severe, the ALJ properly proceeded to the third step of the analysis.

At the third step, the ALJ found that none of Dschaak's impairments was the equivalent of any of the impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1. Tr. 19. The ALJ

therefore properly conducted an assessment of Dschaak's residual functional capacity.

Specifically, the ALJ found that Dschaak had:

> the residual functional capacity to perform light work as defined in 20 CFR
> 416.967(b) except he cannot climb ladders, ropes, or scaffolds; is limited to
> occasional climbing of stairs, kneeling, crouching, crawling, bending, and use of
> foot controls bilaterally; he is limited to simple work that does not require intense
> concentration or reading above a fifth grade level, and routine, low stress work
> that does not involve significant changes or adaptations.

Tr. 20-21. In making this finding, the ALJ considered all of the objective medical evidence in
the record, as well as Dschaak's own statements regarding his ability to perform various activities
of daily living and the frequency and intensity of his pain and other symptoms and limitations.
Tr. 21-23.

At the fourth step of the five-step analysis, the ALJ found that in light of his RFC
Dschaak was unable to perform his past relevant work. Tr. 24.

At the fifth step, the ALJ found that in light of Dschaak's age, education, work
experience, and RFC, there were jobs existing in significant numbers in the national and regional
economies that he could perform. Tr. 24-25. Relying in part on the testimony of the objective
vocational expert, the ALJ cited as examples of unskilled, light jobs that Dschaak could perform
despite the limitations listed in his RFC representative occupations including laundry sorter
(472,000 jobs in the national economy and 5,790 jobs in the regional economy), ticket taker
(106,700 jobs in the national economy and 1,490 jobs in the regional economy), and cafeteria
attendant (401,070 jobs in the national economy and 4,080 jobs in the regional economy). Tr.
24. Based on her finding that Dschaak could perform jobs existing in significant numbers in the
national economy, the ALJ concluded that Dschaak was not disabled as defined in the Act at any
time between December 31, 1993 through November 19, 2009. Tr. 25.

**ANALYSIS**

Dschaak challenges the Commissioner's assessment of his residual functional capacity. Specifically, Dschaak argues that the ALJ improperly ignored medical evidence of Dschaak's alleged organic cognitive impairment at step two of the five-step sequential process, improperly rejected the medical opinions of two examining physicians regarding Dschaak's postural limitations, and improperly rejected Dschaak's own lay opinion testimony. Dschaak further argues that the Commissioner failed to carry his burden at the fifth step of the five-step process in light of the alleged errors in the ALJ's assessment of Dschaak's RFC.

**I.      Residual Functional Capacity**

**A.      Medical Evidence of an Organic Cognitive Disorder**

Dschaak argues that the ALJ committed legal error by failing to consider evidence of a medically determinable impairment, namely Dschaak's alleged cognitive disorder, at step two in the five-step sequential evaluation process. However, no medical expert has conclusively diagnosed Dschaak with a cognitive disorder, and Dschaak's argument is therefore unsupported by the record. Nonetheless, because the record is ambiguous with respect to the possible existence of a cognitive disorder as set forth below, I find that the ALJ committed legal error in failing to discharge her duty to fully and fairly develop the record.

At step two, the ALJ properly found that Dschaak suffered from severe mental impairments, namely a learning disorder and an adjustment disorder with depressed mood. Tr. 18. Dschaak argues that the ALJ failed to consider medical evidence of a cognitive impairment at step two, thereby failing to consider "all medically determinable impairments" throughout the remaining steps in the sequential analysis as required. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007), *citing* 42 U.S.C. § 423(d)(2)(B). Further, Dschaak argues that the ALJ "rejected the

opinions of Drs. Brischetto, Rethinger, and Anderson without comment," thereby "committing

clear error."  (Pl.'s Brief, #12, at 8).

As set forth above, Drs. Brischetto, Rethinger,[6] and Anderson each diagnosed Dschaak

only with "rule out" cognitive disorder NOS.  Tr. 320-21, 364, 411.  Dr. Brischetto did opine in

2004 that "[Dschaak] would be a good candidate for further achievement testing and also more

specific testing with regard to *memory* and learning."  Tr. 365 (emphasis added).  However, in

addition to two subsequent reviews of Dschaak's records by Dr. Rethinger in 2004 and 2008, Tr.

316-30, 432, Dr. Brischetto's examination and findings were followed in 2008 by psychological

examination and review, respectively, by Drs. Tongue and Anderson, Tr. 372-75, 399-416.

Although Dr. Tongue opined that "[a] more thorough intellectual assessment would help to

clarify [Dschaak's] abilities," he did not diagnose even "rule out" cognitive disorder, Tr. 375.  Dr.

Anderson did not conclusively diagnose Dschaak with a cognitive disorder, noting only "rule

out" cognitive disorder NOS, although she did opine that Dschaak showed "impairment in verbal

learning and memory."  Tr. 411.  Consequently, because Dschaak's cognitive disorder was

nowhere found to be a medically determinable impairment, the ALJ had no duty to consider it at

step two, nor at the subsequent steps of the sequential analysis.  *Cf. Orn*, 495 F.3d at 630.

Further, Dschaak's argument that the ALJ erred in rejecting the opinions of Drs.

Brischetto, Rethinger, and Anderson without comment is not substantiated by the ALJ's decision.

In fact, the ALJ explicitly gave "great weight" to Dr. Brischetto's opinion based on her personal

examination of Dschaak, and discussed Dr. Anderson's findings and "afforded significant

weight" to her opinion.  Tr. 23.  With regard to Dr. Rethinger, though the ALJ did not expressly

---

[6]  Dr. Rethinger's opinion of June 9, 2004 is ambiguous in that he appears to diagnose both "[rule out] cognitive disorder" and "cognitive disorder" in the course of completing Form SSA-2506-BK; however, his more recent opinion of May 6, 2008 omits discussion of a potential cognitive disorder altogether.  Tr. 320-21, 432.

discuss his findings, the ALJ noted that his opinion was also given "significant weight" as a reviewing psychologist.  Tr. 23.  More importantly, given that Dr. Rethinger most recently diagnosed Dschaak with "[a]djustment disorder with depressed mood" and "learning disorder NOS [by history]" in 2008, Tr. 432, the ALJ's assessment of Dschaak's severe impairments at step two aligned precisely with Dr. Rethinger's findings and accordingly does not substantiate Dschaak's claim that Dr. Rethinger's opinion was "rejected."  Tr. 18, 432.

### 1.      Duty to Develop the Record

Given the multiple diagnoses of "rule out" cognitive disorder, Tr. 320-21, 364, 411, Dschaak's history of head trauma, Tr. 360-63, as well as the additional testing recommended by Drs. Brischetto and Tongue, Tr. 364-65, 375, I find that the ALJ neglected to fulfill her duty to fully and fairly develop the record where it contains ambiguity.  While Dschaak does not argue that the ALJ committed legal error in failing to further develop the record by ordering additional psychological evaluation or testing regarding a potential cognitive disorder, nor does it appear that Dschaak requested additional evaluation or testing in this regard, I nonetheless analyze the ALJ's potential duty to further develop the record in light of the aforementioned inconclusive evidence regarding Dschaak's possible cognitive disorder.

"In Social Security cases the ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered."  *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983) (citation omitted).  "Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to conduct an appropriate inquiry."  *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001); *see also McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011) ("A specific finding of ambiguity or inadequacy of the record is not necessary to trigger this duty to inquire, where the record

establishes ambiguity or inadequacy." (citation omitted)).  On the other hand, the Commissioner

has broad latitude in ordering a consultative examination, and is not required to pay for an

examination in every case.  *Reed v. Massanari*, 270 F.3d 838, 842 (9th Cir. 2001).  However,

where "[a]mbiguous evidence . . . triggers the ALJ's duty to 'conduct an appropriate inquiry[,]'

[t]he ALJ may discharge this duty in several ways, including:  subpoenaing the claimant's

physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping

the record open after the hearing to allow supplementation of the record."  *Tonapetyan*, 242 F.3d

at 1150 (citations omitted).

Here, consistent with the opinions of Drs. Brischetto, Rethinger, Anderson, and Tongue,

the ALJ did assess Dschaak with a severe impairment of "learning disorder," and in formulating

Dschaak's RFC limited him to "simple work that does not require intense concentration or

reading above the fifth grade level, and routine, low stress work that does not involve significant

changes or adaptations."  Tr. 20-21.  However, neither an assessment of "learning disorder" nor

the limitations assessed by the ALJ in formulating Dschaak's RFC adequately encompass the

limitations potentially posed by a cognitive disorder.  The Diagnostic and Statistical Manual of

Mental Disorders, Fourth Edition (DSM-IV) defines "Cognitive Disorder Not Otherwise

Specified" (294.9) as follows:

> This category is for disorders that are characterized by cognitive disfunction
> presumed to be due to the direct physiological effect of a general medical
> condition that do not meet criteria for any of the specific deliriums, dementias, or
> amnestic disorders listed in this section and that are not better classified as
> Delirium Not Otherwise Specified, Dementia Not Otherwise Specified, or
> Amnestic Disorder Not Otherwise Specified. . . . Examples include 1. Mild
> neurocognitive disorder: impairment in cognitive functioning as evidenced by
> neuropsychological testing or quantified clinical assessment, accompanied by
> objective evidence of a systemic general medical condition or central nervous
> system dysfunction . . . 2. *Postconcussional disorder: following a head trauma,
> impairment in memory or attention with associated symptoms*[.]

Page 32 – FINDINGS & RECOMMENDATION

*Diagnostic and Statistical Manual of Mental Disorders* 179-80 (4th ed. 2000) [hereinafter DSM-IV] (emphasis added). While "Cognitive Disorder Not Otherwise Specified" is listed under "Delirium, Dementia, and Amnestic and Other Cognitive Disorders," the DSM-IV separately lists "Learning Disorders," including "Learning Disorder Not Otherwise Specified," under "Disorders Usually First Diagnosed in Infancy, Childhood, or Adolescence." *Id*. at 39.[7]

Given the significant differences between a "learning disorder" and a "cognitive disorder" evidenced above, my finding that the ALJ committed harmful error at step two turns on the record's ambiguity in light of the opinions of Drs. Brischetto, Anderson, and to some extent Rethinger, as well as the additional testing recommended by Drs. Brischetto and Tongue. Tr. 319-21, 364-65, 374-75, 411-16. This is further compounded by the head injury that Dschaak apparently sustained in 1993, Tr. 360-63, particularly given his reported memory and concentration problems, Tr. 44-45, 47-48, 52, 360-61, 373-75, and the DSM-IV's illustration of a cognitive disorder as including such conditions as, "following a head trauma, impairment in memory or attention with associated symptoms." DSM-IV at 179-80. In fact, as noted above, Dschaak specifically reported to Dr. Brischetto that "since he was hit in the head with a beer bottle [he felt] that his memory hasn't been as good." Tr. 360-61.

Accordingly, given the ambiguity inherent in a diagnosis of "rule out" cognitive disorder, the record's support for the potential existence of such a disorder, and particularly given Drs.

---

[7] Per the DSM-IV, "Learning Disorders" are "characterized by academic functioning that is substantially below that expected given the person's chronological age, measured intelligence, and age-appropriate education." DSM-IV at 39. Further, "[t]here may be underlying abnormalities in cognitive processing (e.g., deficits in visual perception, linguistic processes, attention, or memory, or a combination of these) that often precede or are associated with Learning Disorders." *Id*. at 50. Regarding "Learning Disorder Not Otherwise Specified"[7] (315.9), the DSM-IV states that "[t]his category is for disorders in learning that do not meet criteria for any specific Learning Disorder. This category might include problems in all three areas (reading, mathematics, written expression) that together significantly interfere with academic achievement." *Id*. at 56.

Brischetto and Tongues' specific recommendations that further testing and evaluation be conducted in combination with the ALJ's affordance of "great weight" to these two opinions, Tr. 23, the record as a whole reflects the need for such additional inquiry in order to ensure that the ALJ's assessment of Dschaak's combined impairments was based on a "fully" developed record. *Brown*, 713 F.2d at 443; *see also Tonapetyan*, 242 F.3d at 1150-51 (holding that given the ALJ's strong reliance on a doctor's testimony, the ALJ was not free to ignore that same doctor's equivocations, "concern over the lack of a complete record upon which to assess [the claimant's] mental impairment," nor his specific recommendation that more detailed information be obtained).

Finally, the ALJ's failure to address this ambiguity in the record did not constitute harmless error,[8] as Dschaak's memory problems, both reported and substantiated by medical evidence of record, Tr. 44-45. 47-48, 52, 362-65, 373-75, were not incorporated into Dschaak's RFC. Tr. 20-21. On remand, the ALJ should therefore order further development of the record in order to determine the nature and extent of Dschaak's potential cognitive impairment and/or memory problems such that—if indeed they are substantiated by further evaluation and testing—they are properly considered at each step of the sequential evaluation process.

### B.    Opinions of Examining Physicians Drs. Ramsthel and Robinson

Dschaak argues that the ALJ erred by rejecting the opinions of examining physicians Drs. Ramsthel and Robinson. (Pl.'s Brief, #12, at 16-19.) He argues that the ALJ, while affording "significant weight" to these doctors' opinions, improperly rejected postural limitations assessed

---

[8] "A decision of the ALJ will not be reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005), *citing Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1991). An ALJ's error is harmless where it is inconsequential to the ALJ's ultimate determination and the ALJ's determination is supported by substantial evidence of record. *See Carmickle v. Comm'r of SSA*, 533 F.3d 1155, 1162 (9th Cir. 2008); *Batson*, 359 F.3d at 1195-97.

by them that would lead to an RFC limiting Dschaak to "sedentary" rather than "light" work. *Id.* I find that although the ALJ failed to provide specific, legitimate reasons for rejecting the limitations posed by Dr. Robinson as required by law, this amounted only to harmless error given the vocational expert's testimony that Dschaak could perform jobs existing in significant numbers in the national economy even if restricted to sedentary rather than light work.

The controverted opinion of an examining physician may only be rejected for specific, legitimate reasons. *See Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995). Here, as set forth above, Dr. Ramsthel opined in 2004 that Dschaak could stand and walk for approximately five to six hours in an eight-hour day if permitted to rest for 15-20 minutes after each hour and a half.[9] Tr. 368. More recently, in 2008, Dr. Robinson opined that Dschaak was limited to standing and walking for three hours during an eight-hour day, with breaks. Tr. 425. "Light work" requires that the claimant be capable of "standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday." S.S.R. No. 83-10p, 1983 WL 31251, at *5-6; *see also* 20 C.F.R. §§ 404.1567(b), 416.967(b).

First, contrary to Dschaak's argument, it appears that the ALJ did not reject Dr. Ramsthel's opinion regarding Dschaak's ability to stand and walk, but rather relied upon it—instead rejecting Dr. Robinson's opinion setting forth more severe limitations on standing and walking. Tr. 22-23. Accordingly, Dschaak's argument that the ALJ improperly assessed him with the ability to perform light work is tied only to the ALJ's rejection of Dr. Robinson's opinion.[10] The ALJ stated:

_____

[9] Incidentally, the ALJ incorrectly reported Dr. Ramsthel's findings in her decision, conflating his opinion regarding Dschaak's ability to sit with his opinion regarding Dschaak's ability to stand and walk. Tr. 22, 368.

[10] The ALJ's rejection of Dr. Ramsthel's opinion pertained only to his assessment of Dschaak's capacity for sitting. Tr. 22-23. However, the ALJ's rejection of Dr. Ramsthel's opinion that

Page 35 – FINDINGS & RECOMMENDATION

> After review of the record, the undersigned affords significant weight to the opinions of Drs. Ramsthel and Robinson as they are based on personal examination of the claimant and are generally supported by the record of evidence.  However, regarding Dr. Robinson's opinion of the claimant's ability to stand and walk, *after hearing the claimant's testimony regarding his activities of daily living and the record as a whole*, the undersigned finds that the claimant is less limited in his ability to stand and/or walk during an eight-hour workday than was estimated by Dr. Robinson.

Tr. 23 (emphasis added).  The ALJ thus provided two reasons for rejecting Dr. Robinson's opinion in effect limiting Dschaak to sedentary work:  first, that Dschaak's testimony regarding his own activities of daily living does not support a finding that he can stand or walk for only three hours in an eight-hour day, and second, that the record as a whole does not support such a limitation.  *Id*.  I find that while these reasons are specific, neither is legitimate.  *See Andrews*, 53 F.3d at 1043.

Dschaak's testimony regarding his activities of daily living, as set forth in greater detail in Part I.C below, does not indicate that he can stand or walk for six hours during an eight-hour workday.  He testified that he does do some housework and cooking for his mother and aunt; however, he testified that his mother helps him with these tasks, Tr. 52, that he takes frequent and sometimes indefinite breaks to lie down and take weight off of his back, knees and hips, Tr. 45, 51, and that a landscaper attends to the yard and any mowing Dschaak engages in is apparently infrequent and limited to "maybe a sprout of grass here and there."  Tr. 47.  He further testified that he drives four blocks to the store to obtain food and/or his mother's and aunt's prescriptions, and would only walk those four blocks if necessary due to snow and ice that would

---

Dschaak could sit for "a little bit less" than five to six hours in an eight-hour day, or approximately four hours, Tr. 368, was supported by a specific, legitimate reason:  the opinion's inconsistency with the record.  The ALJ found that Dschaak was capable of sitting for six hours in an eight-hour day, and every other examining and reviewing physician either came to the same conclusion or opined that Dschaak was not limited at all in his capacity for sitting.  Tr. 335, 398, 425, 431.

presumably make driving impossible.  Tr. 38, 43.  More generally, Dschaak's testimony and the record as a whole indicate that he spends the balance of his day watching television, playing video games, doing occasional housework and cooking with his mother's help, driving four blocks to the store for food and/or prescriptions, napping due to poor sleep during the night, and lying down to relieve his pain.  Tr. 45-46, 51, 360, 373-74.

Regarding the record as a whole, the ALJ did not specifically point to any evidence controverting Dr. Robinson's opinion beyond her earlier reference to Dr. Ramsthel's opinion that Dschaak could stand or walk for five to six hours during an eight-hour day, with 15-20 minute breaks every hour and a half.  Tr. 22-23.  The ALJ then rejected Dr. Ramsthel's opinion regarding Dschaak's ability to sit based on the same reason given for rejecting Dr. Robinson's opinion—that this opinion was not consistent with the record.  Tr. 23.  In other words, it appears that the ALJ credited those portions of the opinions of Drs. Ramsthel and Robinson supporting lesser limitations on Dschaak's functioning, while rejecting those portions of both doctors' opinions imposing more substantial limitations.  Tr. 22-23.  More importantly, the record as a whole simply does not support rejection of Dr. Robinson's opinion regarding Dschaak's ability to stand or walk.  While Dr. Robinson's opinion was controverted by non-examining state agency physician Linda Jensen, M.D., her review of Dschaak's records was conducted in February 2004 when Dschaak's medical records were sparse at best and the only examining physician's report was that of Dr. Ramsthel.  Tr. 334-39.  The remainder of the record, more fully developed in early 2008 following extensive X-rays, Tr. 420-21, clearly supports a sedentary RFC consistent with Dr. Robinson's findings.  *Id.*; Tr. 391-98, 422-26, 431, 436-37, 439-41, 435.  In other words, the record simply does not contain substantial evidence supporting the ALJ's finding that Dschaak is capable of performing light work.

Page 37 – FINDINGS & RECOMMENDATION

Specifically, X-rays taken on February 11, 2008, revealed osteopenia, mild degenerative disc changes at several levels in Dschaak's thoracic spine, a compression fracture of T11, loss of vertebral body height, spinal curvature, degenerative facet changes in the lumbar spine, degenerative changes at the pubic symphysis, degenerative changes at the proximal tibiofibular joint, and more generally "[p]ost-traumatic and post-surgical changes with secondary osteoarthritis." Tr. 420-21. Subsequent X-rays focused on Dschaak's multiple hereditary exostoses revealed, as noted above, numerous and often large osteochondromas and exostoses on Dschaak's pelvis, femurs, tibias, and fibulas. Tr. 437. The remaining opinion evidence also uniformly supports a sedentary RFC. Dr. Berner specifically opined that Dschaak was limited to a "sedentary rfc" with additional postural limitations, and opined that Dschaak could stand and/or walk for two hours in an eight-hour day with normal breaks. Tr. 392, 398. Dr. Alley also limited Dschaak to a "sed[entary] rfc," opining that he was capable of standing and/or walking for only three hours in an eight-hour day, consistent with Dr. Robinson's assessment. Tr. 431.

However, as noted above, though the ALJ erred in rejecting Dr. Robinson's opinion without providing specific, legitimate reasons for doing so, this error was ultimately harmless. *See Carmickle*, 533 F.3d at 1162. At the October 14, 2009, hearing, the ALJ asked the impartial vocational expert, "[i]f we further restrict the hypothetical individual to *sedentary work* but retain the other limitations, would there be a significant number of jobs?" Tr. 55 (emphasis added). In response, the vocational expert cited as examples of sedentary work that Dschaak could perform given the other limitations included in his RFC occupations such as addresser (129,420 jobs in the national economy and 640 jobs in the regional economy), order clerk for food and beverages (255,670 jobs in the national economy and 3,250 jobs in the regional economy), and telephone information clerk (1,100,790 jobs in the national economy and 14,270 jobs in the regional

economy).  Tr. 55-56.

### C.    Dschaak's Testimony and Credibility

In a Function Report and Pain Questionnaire dated October 9, 2007, Dschaak asserted

that "pain wakes me up an [*sic*] takes hours for pain to go away buy [*sic*] that time I am up

[a]llday [*sic*]."  Tr. 211.  He reported that he can walk "[a]bout 2 blocks" before needing to stop

and rest, with the period of rest required determined by "how bad the pain is."  Tr. 215.  When

asked to describe his pain, he characterized it as "cronic [*sic*] sharp stinging aching growing bone

pain," located in his "back, knees joints hips in between joints."  Tr. 243.  Dschaak further stated

that this pain occurs "everyday all the time," is precipitated by "walking standing sitting sleeping

bending over for long periods of time an [*sic*] weather conditions," and is exacerbated by cold

weather.  *Id*.  When asked what ameliorates his pain, Dschaak simply replied "don't know."  *Id*.

On a disability report form submitted April 3, 2008, Dschaak stated: "I am in everyday pain . . .

It's hard to take care of myself because I'm so out of it. I can't bend over hardly, and the pain

makes me have headaches all the time, I feel nauseated because of it."  Tr. 227-28, 230-31.

At the hearing before ALJ Hartman on October 14, 2009, Dschaak testified that he drives

approximately four blocks (having received a ride to the hearing), Tr. 38, can walk four blocks if

necessary to obtain food or prescriptions for his mother and aunt,[11] can stand for five to ten

minutes at a time, apparently with pain,[12] can sit for approximately an hour and a half with pain,

---

[11]  As noted above, Dschaak's testimony in this instance was apparently based on a worst case
scenario. He testified that "if [he] had to" due to "snow and ice" (*i.e.* if driving was not an
option), he "would" walk four blocks to Safeway "to get food for our house, and my aunt and my
mom's prescriptions."  Tr. 43.

[12]  Many of Dschaak's functional limitations appear to be tied to the degree of pain he is
allegedly experiencing at any given time.  His hearing testimony regarding postural limitations
was accompanied by the caveat that "my back's killing me now, right now," Tr. 43, and given his
limited intellect and capacity for understanding as evidenced above it is likely that his testimony

can carry "a couple bags of groceries," cannot squat, stoop, or bend over without substantial

back, knee, or hip pain, and experiences pain and cramping—worse in his dominant right hand—

when grasping objects.  Tr. 43-44.  He additionally testified that after watching television for

approximately one hour he needs to lie down in order to relieve pain in his back, hips, and/or

knees, Tr. 45, and that following his motor vehicle accident he has experienced ongoing tingling

in his legs and feet in addition to increased back pain.  Tr. 50.  During the hearing he stated: "I'm

in pain right now . . . I, my back is killing me, I need to lay [*sic*] down, my knees are killing me

. . . and that's why I lay [*sic*] down because it takes the weight off my knees and my back . . . and

my hip."  Tr. 51.  Dschaak testified that he generally needs to lie down two to three times per

day, though "it could be one time a day, it could be all day, I mean . . . it really depends on how

I'm really feeling that day."  *Id*.  Generally, when asked by the ALJ to describe "the physical

problems [he] ha[s] now that keep [him] from working," Dschaak testified:

> The cracking, poppings in my knees, my shoulders, my hands, they feel like
> they're arthritic, they cramp up and they, they tend to want to like start clinching
> up.  My back, I got two crushed discs in my back, fractured vertebrae, let's see,
> one leg's longer than the other so my hips are cattywampassed and they've been
> like that for 38 years, and they feel like an 80-year-old hip.  My knees feel like
> 90-year-old hips or knees, they crack and pop all the time.  I hobble, I got a
> hunched back, and I've been hacked on for most of my childhood life.  I got a
> metal plate in my leg, and I'm, I'm just tired of being hacked on . . . I got over 16
> surgeries on my, around my knees, removing tumors off of my body that have
> been growing on my body.  I got one on my pubic bone.  I can't have
> grandchildren for my mom, I can't have any children because I don't want them to
> go through the pain and suffering that I've gone through.

Tr. 40-41.  On a scale of one to ten—ten "being pain so severe that you actually go to the

emergency room for treatment"—Dschaak testified that his pain ranges from an eight on

his best days to a ten on his worst days, though he "can't afford to go to an emergency

---

in this regard was based on present sensation rather than a more global assessment of his own
limitations.

room."  Tr. 42.

With regard to his mental limitations, Dschaak testified that he "probably" suffers from mental problems that affect his ability to work based on his history of special education, that his ability to read the newspaper is limited to "[m]aybe a horoscope, that's about it," and that he has difficulty with short-term memory as well as concentration.  Tr. 44-45, 47-48, 52.

When a claimant's medical record establishes the presence of a "medically determinable impairment" that "could reasonably be expected to produce the [claimant's alleged] pain or other symptoms," the ALJ must evaluate the claimant's credibility in describing the extent of those symptoms.  20 C.F.R. § 404.1529.   In weighing a claimant's credibility, the ALJ conducts a two-part analysis.  In the first part, the claimant "must produce objective medical evidence of an underlying impairment" or impairments that could reasonably be expected to produce some degree of symptoms.  *Tommasetti v. Astrue*, 533 F.3d 1035, 1939 (9th Cir. 2008), *quoting Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996).  If the claimant meets this threshold and there is, as here, no affirmative evidence of malingering, the ALJ moves to the second part of the analysis.  There, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, *clear and convincing* reasons for doing so."  *Id.*, *quoting Smolen*, 80 F.3d  at 1281, 1283-84 (emphasis added).

In evaluating a claimant's credibility, the ALJ may consider, *inter alia*, the "claimant's reputation for truthfulness, inconsistencies either in claimant's testimony or between h[is] testimony and h[is] conduct, claimant's daily activities, h[is] work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which claimant complains."  *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (internal modifications omitted), *citing Light v. SSA*, 119 F.3d 789, 792 (9th Cir. 1997).  In the event that

the ALJ determines that the claimant's report is not credible, such a determination must be made "with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas*, 278 F.3d at 959, *citing Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991) (*en banc*).

Here, in the first part of her credibility analysis, the ALJ found that Dschaak's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." Tr. 21. In the second part, the ALJ determined that Dschaak's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible for four separate reasons. Tr. 21-22. I analyze these reasons below and find that each is not sufficiently clear and convincing to justify rejecting Dschaak's testimony regarding the severity of his symptoms and resultant functional limitations.

### 1.    Activities of Daily Living

Just as she did in rejecting postural limitations posed by Dr. Robinson as noted above, in rejecting Dschaak's credibility the ALJ relied heavily throughout her decision on Dschaak's reported activities of daily living, namely those activities related to caring for his mother and aunt. Tr. 19, 21, 23. Specifically, the ALJ noted that Dschaak cares adequately for himself, cooks, cleans, shops, and "mow[s] the lawn if necessary" for his mother and aunt, and additionally "help[s] his aunt, who weighs over three hundred pounds, out of her [electronic wheel]chair when she needs to stand." Tr. 19, 21. However, the ALJ erred both in overstating the nature and extent of these activities based on the evidence of record, and more importantly in failing to make specific findings that Dschaak spends a substantial part of his day engaged in activities involving physical activity that are also transferrable to the workplace, pursuant to Ninth Circuit precedent.

Page 42 – FINDINGS & RECOMMENDATION

First, the nature and extent of Dschaak's activities of daily living do not support an

adverse credibility determination.  Contrary to the ALJ's finding that Dschaak's activities include

"helping his aunt, who weighs over three hundred pounds, out of her chair when she needs to

stand," Dschaak in fact testified as follows:

> [M]y aunt is 360 pounds that lays [*sic*] in a chair and the only person that has any
> sort of strength in case there's an emergency to get, because her chair is electronic,
> if the power goes out, I'm the only one that can get her up and out of that chair.  If
> the house was on fire, I'm the only one because firefighters are not going to be
> there if the house is on fire or if the power goes out and she needs to get up and go
> to the bathroom, I mean, she's really stuck in her chair.

Tr. 52.  In other words, as Dschaak correctly points out, "Plaintiff did not testify that he routinely

lifts his aunt out of her chair, he testified that he was the only one who could render assistance in

the event of an emergency."  (Pl.'s Brief, #12, at 11.)

With regard to Dschaak's daily activities around the house, in return for which he

receives "a roof over [his] head," the ALJ further failed to take into account Dschaak's mother's

assistance with these tasks.  Tr. 46, 52.  Dschaak testified that his aunt is severely disabled, but

that his mother is "more capable of doing things around the house with [him]" and assists him

with the cooking and cleaning.  *Id.*  The ALJ also stated that Dschaak reported being able to "do

house cleaning without any particular reported limitations."  Tr. 21.  In fact, Dschaak testified

that he does indeed do some house cleaning, but needs to take breaks throughout the day to lie

down in order to take weight off of his knees, back, and hips and relieve some of his pain.  Tr.

45, 51.  He testified that he generally needs to lie down anywhere from two to three times a day,

though "depending on if [his] mom and [his] aunt need something," he may lie down one time

during the day or spend the entire day lying down.  Tr. 51.  He also testified that the family has

an automatic dishwasher.  Tr. 47.  Finally, the ALJ noted that Dschaak reported that he is able to

"mow the lawn if necessary."  Tr. 21.  In fact, Dschaak testified that a landscaper handles this

Page 43 – FINDINGS & RECOMMENDATION

task, Tr. 47, though he did go on to testify that if the grass gets tall enough to mow he will mow it, though the grass "is not even worth mowing" and amounts to "maybe a sprout of grass here and there," indicating that on the infrequent occasions when he does perform this task it requires minimal time and effort. *Id*.

Second, although the record clearly reflects that Dschaak does engage in some daily activities such as light housework and running errands for his mother and aunt, the ALJ improperly relied on this conduct to reject Dschaak's testimony. An ALJ may look to testimony of a claimant's daily activities to support a finding that subjective pain complaints are not credible. *Gonzalez v. Sullivan*, 914 F.2d 1197, 1201 n.2 (9th Cir. 1990). If, despite his or her claims of pain, "a claimant is able to perform household chores and other activities that involve many of the same physical tasks as a particular type of job, it would not be farfetched for an ALJ to conclude that the claimant's pain does not prevent the claimant from working." *Id.*, *quoting Fair v. Bowen*, 885 F.2d 597, 602-04 (9th Cir. 1989). Yet, "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, . . . and many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible *to periodically rest or take medication*." *Id*. (emphasis added); *see also Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) ("This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities . . . does not in any way detract from her credibility as to her overall disability. One does not need to be 'utterly incapacitated' in order to be disabled.") (citations omitted).

For example, a claimant may have the capacity to travel periodically, cook meals, and wash dishes and still be prevented from working. *Fair*, 885 F.2d at 603. Thus, "if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of

physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit an allegation of disabling excess pain." *Gonzalez*, 914 F.2d at 1201.  Ninth Circuit precedent therefore suggests that an ALJ may only discredit a claimant's pain testimony by specifically finding both that: (1) the claimant spends a substantial part of his or her day engaged in physical activities; and (2) those activities are of the same type that the claimant would use in a work setting.

This is not the case here.  As set forth above, Dschaak engages in minimal housework and both receives help from his mother and takes frequent and sometimes lengthy breaks to lie down in order to relieve his pain.  Tr. 45-46, 51-52.  His most extensive daily activities appear to consist of picking up food for the home and prescriptions for his mother and aunt; however, he testified that he drives only four blocks to a nearby Safeway store to do so, and apparently would only walk if prevented from driving by snow and ice.  Tr. 38, 43.  He additionally reported, on a disability questionnaire dated October 9, 2007, that he walks his dog only "if not in pain in my knees or back."  Tr. 211.  Based on the evidence of record, the daily activities Dschaak describes—involving relatively minimal physical activity, performed with assistance, and interrupted with frequent and sometimes lengthy breaks to lie down—neither involve substantial daily periods of physical activity nor consist of activity of the same type that one would perform in a work setting.  As stated above, the record as a whole indicates that Dschaak spends the majority of his day watching television, playing video games, doing occasional housework and cooking with his mother's help, driving four blocks to the store to get food and/or prescriptions, napping due to poor sleep during the night, and lying down to relieve his pain.  Tr. 45-46, 51, 360, 373-74.  Accordingly, Dschaak's daily activities do not constitute a clear and convincing reason for rejecting his symptom testimony.  Rather, they appear to support it.

### 2.    Gaps in Treatment

In discrediting Dschaak's testimony, the ALJ additionally relied on the fact that "[t]he claimant also has significant gaps in his history of treatment for his allegedly disabling impairments." Tr. 22.  While this is indeed the case, based on Ninth Circuit precedent it does not constitute a legally sufficient basis for discrediting Dschaak's symptom testimony.  Dschaak has apparently been homeless, without substantial gainful employment or income and without medical insurance,[13] since his alleged disability onset date.  Tr. 37-38.  The Ninth Circuit stated, under similar circumstances:

> [The claimant's] failure to receive medical treatment during the period that he had no medical insurance cannot support an adverse credibility finding.  We have held that an "unexplained, or inadequately explained, failure to seek treatment" may be the basis for an adverse credibility finding unless one of a "number of good reasons for not doing so" applies.  But, "[d]isability benefits may not be denied because of the claimant's failure to obtain treatment he cannot obtain for lack of funds."

*Orn*, 495 F.3d at 638, *quoting Gamble v. Chater*, 68 F.3d 319, 321 (9th Cir. 1995); *see also* 20 C.F.R. § 416.930; S.S.R. No. 96-7p, 1996 WL 374186 (before drawing a negative inference from a claimant's failure to seek treatment, the ALJ must first consider "any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment"); *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987) ("[T]he medicine or treatment an indigent person cannot afford is no more a cure for his condition than if it had never been discovered.").

Based on this extensive body of law, the ALJ clearly erred in failing to consider Dschaak's indigence when basing her adverse credibility determination in part on his sparse

---

[13]   The record does indicate that Dschaak was covered by the Oregon Health Plan (OHP), a state-funded health insurance program, at some point in the relatively distant past.  Tr. 358-60.  However, he testified that he has not received "any money or any state help or anything" for the past 15 years.  Tr. 37-38.

history of medical treatment.[14]

### 3.    Lack of Medication

In discrediting Dschaak's testimony, the ALJ further stated that "despite the claimant's allegedly disabling impairments, there have been significant periods of time since the alleged onset date during which the claimant has not taken any medications for his symptoms." Tr. 21. Much like Dschaak's lack of treatment, the ALJ's reliance on this basis for rejecting Dschaak's symptom testimony fails to comport with Ninth Circuit precedent. In addition, while she did mention it, the ALJ failed to take into account Dschaak's use of medical marijuana to aid in treating his pain.

As set forth above, an ALJ must take into account any good explanations offered by a claimant regarding failure to seek treatment for alleged pain and other symptoms. Likewise, "[n]either may an ALJ rely on the claimant's failure to take pain medication where evidence suggests that the claimant had a good reason for not taking medication." *Fair*, 885 F.2d at 602, *citing Gallant v. Heckler*, 753 F.2d 1450, 1455 (9th Cir. 1984). And again, as the Fifth Circuit aptly stated, "the medicine or treatment an indigent person cannot afford is no more a cure for his condition than if it had never been discovered." *Lovelace*, 813 F.2d at 59; *see also Orn*, 495 F.3d at 638; *Gamble*, 68 F.3d at 321.

Here, Dschaak has utilized and continues to utilize medical marijuana to treat his pain, though his card apparently lapsed. Tr. 42-43. He reports that he does not pay for marijuana, but rather obtains it from friends at no charge. Tr. 360. More importantly, given Dschaak's undisputed indigence, the ALJ did not apply clear and convincing reasoning in discrediting

---

[14]   Further, Dschaak did receive extensive medical treatment during childhood—including over 16 surgeries—presumably because he was covered by his family's medical insurance or was otherwise able to obtain the treatment as a minor child. Tr. 41, 464-70, 474-76, 484-86.

Dschaak's symptom testimony based upon his failure to take medication that he could not afford

to obtain.  *See*, *e.g.*, *Orn*, 495 F.3d at 638.

### 4.        Medical Evidence of Record

Finally, the ALJ stated that "[t]he medical opinion[15] evidence of record is also

inconsistent with the claimant's allegations." Tr. 22.  Regarding Dschaak's physical limitations,

the ALJ cited a number of examples drawn from two state agency consultative examinations and

the opinion of one reviewing state agency medical consultant.  Tr. 22.  Specifically, the ALJ

relied on Dr. Ramsthel's opinion that Dschaak could "sit for five to six hours in an eight-hour day

for up to ninety minutes at a time, stand for four hours in an eight hour day for forty-five minutes

at a time, frequently lift ten to fifteen pounds, and infrequently lift thirty pounds." Tr. 22.  The

ALJ further noted Dr. Ramsthel's conclusion that Dschaak "had unlimited capacity for handling

objects, traveling, hearing, and speaking." Tr. 22.  The ALJ also relied on the opinions of Drs.

Robinson and Berner, citing Dr. Robinson's above-mentioned opinion regarding Dschaak's

postural limitations, as well as the fact that she "did not detect any manipulative, visual,

communicative, or environmental restrictions." *Id*.  The ALJ then cited Dr. Berner's findings

that Dschaak could occasionally lift and/or carry up to 20 pounds, frequently lift and/or carry ten

pounds, stand and/or walk for at least two hours in an eight-hour day, sit for about six hours in an

eight-hour workday, push or pull without restriction, and occasionally climb, stoop, kneel,

crouch, crawl, and frequently balance.  *Id*.  Finally, the ALJ echoed additional portions of Drs.

Ramsthel, Robinson, and Berners' objective medical findings and diagnoses—detailed at length

above—in rejecting Dschaak's symptom testimony.  *Id*.  The ALJ erred in two different ways by

---

[15]  While the ALJ refers exclusively to "opinion" evidence, much of the specific evidence cited
consists of selected objective medical findings noted by Dschaak's examining doctors.  Tr. 22-
23.

relying on a purported lack of objective medical findings substantiating Dschaak's reported functional limitations.

First, contrary to the ALJ's account and conclusion, the record includes numerous objective medical findings confirming Dschaak's functional limitations, including many of the limitations assessed by Drs. Ramsthel, Robinson, and Berner cited by the ALJ as noted above. For example, the record is replete with evidence concerning Dschaak's multiple exostoses and osteochondromas, which Dr. Adler believed to be "contributing to [Dschaak's] chronic pain." Tr. 420-21, 435-37, 439-41. The record also indicates that Dschaak sustained a T11 compression fracture with degenerative changes, an anterior compression fracture of T12, wedge compression of T12, degenerative changes in the lower lumbar spine and pubic symphysis, and "[p]ost-traumatic and post-surgical changes with secondary osteoarthritis." Tr. 420-21, 451-52, 454-55. Additionally, upon physical examination Dr. Robinson found mild crepitus in the knees bilaterally with flexion, mild tenderness to the lumbar spine with palpation, reduced strength in the upper and lower extremities, and decreased range of motion in the upper and lower extremities along with mildly decreased range of motion in the lumbar spine. Tr. 424-25. Dr. Ramsthel also found that Dschaak's pain was exacerbated by the Valsalva maneuver, Tr. 366, and Dr. Adler found decreased range of motion in the right hip as well as decreased motor function in the quadriceps, hamstring, tibialis anterior, gastrocnemius, soleus, and iliopsoas. Tr. 436-37. These are exactly the types of objective medical findings that the Social Security regulations instruct adjudicators to rely upon when analyzing a claimant's pain-related functional limitations. 20 C.F.R. § 404.1529(c)(2) ("Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of *reduced joint motion*, *muscle spasm*, sensory deficit, or *motor disruption*. Objective

Page 49 – FINDINGS & RECOMMENDATION

medical evidence of this type is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, *such as pain*, may have on your ability to work.") (emphasis added).

Moreover, even if the record lacked objective evidence of Dschaak's pain and functional limitations, the ALJ would still have erred in relying on that absence to discredit his testimony. Social Security Ruling 96-7p provides that "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence."  S.S.R. No. 96-7p, 1996 WL 374186, at *3.  Thus, "whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record."  *Id*. at *6.  More specifically, an ALJ must examine the following factors:

> 1. The individual's daily activities;
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
> 3. Factors that precipitate and aggravate the symptoms;
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (*e.g.*, lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *8.  As the ruling makes clear, when a claimant alleges limitations from severe pain, the ALJ must go beyond objective medical evidence to properly evaluate the claimant's credibility. Per the Ninth Circuit, "as we have repeatedly stated, the ALJ may not discredit pain testimony

merely because a claimant's reported degree of pain is unsupported by objective medical findings." *Fair*, 885 F.2d at 602 (citations omitted).

While the ALJ did consider several of the listed factors as discussed above, albeit without applying clear and convincing reasoning supported by substantial evidence in the record, she entirely omitted several factors crucial to Dschaak's testimony. Specifically, the ALJ failed to consider the location, duration, frequency, and intensity of Dschaak's pain, which he describes as severe enough to cause nausea and headaches, and which he testified rates at a level of eight on a ten-point scale on his "best days." Tr. 42, 227-28, 230-31. The ALJ further failed to take into account the exacerbation of Dschaak's pain by cold weather, Tr. 243, as well as by sleeping. *Id*. Finally, the ALJ neglected to evaluate the effect on Dschaak's functional limitations posed by his reported need to lie down, on average, two to three times per day in order to alleviate stress on his back, knees, and hips. Tr. 51. Dschaak additionally testified that this means of relieving pain and symptoms can be necessary for extended periods of time up to and including lying down "all day." *Id*. The ALJ likewise failed to consider this in evaluating Dschaak's credibility.

In sum, the ALJ failed to provide clear and convincing reasons to support her rejection of Dschaak's testimony. First, the ALJ improperly concluded that Dschaak's daily activities were inconsistent with his alleged limitations by both misconstruing the extent of those daily activities and failing to apply the correct legal standard established by Ninth Circuit precedent. *See*, *e.g*., *Vertigan*, 260 F.3d at 1050. Second, the ALJ relied on Dschaak's limited history of treatment and medication without taking into account evidence of Dschaak's "good reasons" for failing to seek treatment and medication as required by the Ninth Circuit. *See*, *e.g*., *Fair*, 885 F.2d at 602-03. Third, the ALJ improperly focused on a purported lack of objective medical evidence of functional limitations as an independent measure of Dschaak's credibility. *See* S.S.R. No. 96-7p,

1996 WL 374186.  Finally, the ALJ's reliance on these four justifications for discrediting

Dschaak's testimony did not constitute harmless error, as the ALJ provided no additional

evidence supporting her credibility determination.  *Cf. Carmickle*, 533 F.3d at 1162, *quoting*

*Batson*, 359 F.3d at 1197 (error is harmless and does not warrant reversal so long as there is

additional "evidence supporting the ALJ's conclusions on . . . credibility" and the error "does not

negate the validity of the ALJ's ultimate [credibility] conclusion").

## II.    Step Five: Existence of Jobs that Dschaak Could Perform in the National Economy

As discussed above, Dschaak argues that the ALJ erred in assessing his residual

functional capacity.  On that basis, Dschaak argues that the Commissioner failed to meet his

burden at the fifth step of the five-step process to demonstrate that, in light of his residual

functional capacity, Dschaak was capable of performing jobs existing in significant numbers in

the national economy.  As set forth above, because the record was not fully and fairly developed

given its ambiguity regarding Dschaak's possible cognitive disorder, and because the ALJ erred

in rejecting Dschaak's own lay opinion testimony regarding the extent of his pain and limitations,

the hypothetical posed to the vocational expert did not take into account all of Dschaak's

limitations and therefore constituted legal error.  "The hypothetical an ALJ poses to a vocational

expert, which derives from the RFC, 'must set out *all* the limitations and restrictions of the

particular claimant.'"  *Valentine v. Comm'r Soc. Sec. Admin*., 574 F.3d 685, 690 (9th Cir. 2009),

*quoting Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988) (emphasis in original).

Accordingly, on remand the ALJ should fully and fairly develop the record, take all of

Dschaak's symptoms and limitations into account to the extent that they are consistent with the

record as a whole, reformulate Dschaak's RFC, and elicit testimony from a vocational expert to

determine what jobs existing in significant numbers in the national economy Dschaak can

perform, if any, in light of his symptoms and functional limitations.

## CONCLUSION

For the reasons set forth above, I recommend that the Commissioner's final decision in connection with Dschaak's September 14, 2007 applications for DIB and SSI benefits be reversed and remanded for further proceedings consistent with this opinion.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 15th day of August, 2011.

 /s/ Paul Papak
Honorable Paul Papak
United States Magistrate Judge